# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| Mark Duffer, | |
| Plaintiff, | Case No. 13 C 3756 |
| v. | |
| United Continental Holdings, Inc., *et al.*, | Judge John Robert Blakey |
| Defendants. | |

## MEMORANDUM OPINION AND ORDER

This is a putative class action brought under the Uniformed Services Employment and Reemployment Rights Act of 1994 ("USERRA"), which protects service members in their civilian employment. Plaintiff Mark Duffer was a Continental pilot who also served as a Lieutenant Colonel in the United States Marines Corps Reserve. Plaintiff alleges that Defendants violated USERRA and related state laws in multiple ways, such as by underpaying him during military leave periods. Defendants are United Continental Holdings, Inc. ("UCH"), United Air Lines, Inc. ("United"), Continental Airlines, Inc. ("Continental") (together with UCH and United, the "Company") and the Air Line Pilots Association, International ("ALPA"). Defendants deny that they violated USERRA and related state laws in any way and move for partial summary judgment. For the following reasons, Defendants' summary judgment motion [161] is granted in part and denied in part.

## I.      Legal Standard

Summary judgment is appropriate if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. *Spurling v. C & M Fine Pack, Inc.*, 739 F.3d 1055, 1060 (7th Cir. 2014). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). In determining whether a genuine issue of material fact exists, this Court must construe all facts and reasonable inferences in the light most favorable to the nonmoving party, here, Plaintiff. *See CTL ex rel. Trebatoski v. Ashland School District*, 743 F.3d 524, 528 (7th Cir. 2014).

## II.      Facts

### A.      Merger between United and Continental

In October 2010, pre-merger United (post-merger United is just referred to as "United") and Continental merged, with UCH becoming their parent corporation. Joint Statement of Undisputed Material Facts ("SOF") ¶ 2. Before the merger, ALPA had served as the collective bargaining representative for the pilots at both carriers. SOF ¶ 3. In that role, ALPA had negotiated separate collective bargaining agreements for each pilot group. SOF ¶ 3. The agreement between ALPA and Continental (the "ALPA-Continental CBA") became amendable on January 1, 2009,

while the agreement between ALPA and pre-merger United (the "ALPA-United CBA") became amenable one year later, on January 1, 2010. SOF ¶ 4.

Plaintiff Mark Duffer was a Continental pilot before the merger. SOF ¶ 38. Though not included in the Joint Statement of Undisputed Material Facts, there is no apparent dispute that Plaintiff also served as a Lieutenant Colonel in the United States Marines Corps Reserve at all relevant times. Third Amended Complaint ("TAC") ¶ 5. In that role, Plaintiff took periodic leaves of absence from Continental for military service. PSOF ¶ 43 (citing Plaintiff's Military Leave Verification at UNITED 002203-24).

Following the merger, United, Continental and ALPA (through a committee selected by the elected representatives of each pilot group, known as "Master Executive Councils") began negotiating a joint collective bargaining agreement to cover the combined pilot group, comprising pre-merger Continental pilots (the "s-CAL pilots"), pre-merger United pilots (the "s-UAL pilots") and pilots hired after the merger. SOF ¶¶ 5-6, 9-10. In the negotiations, ALPA sought retroactive payments for these pilots for the period from the amendable dates of their pre-merger collective bargaining agreements (that is, the ALPA-Continental CBA and the ALPA-United CBA) until the effective date of the new agreement. SOF ¶ 14. Continental pilots call this period the "Relevant Time Period." Continental pilots had not had their contractual hourly rates of pay or pension plan contribution rates increased during the Relevant Time Period. SOF ¶¶ 14, 21.

On August 2, 2012, ALPA and the Company reached an Agreement in Principle resolving their dispute. SOF ¶ 12. As part of the Agreement in Principle, the Company agreed to the following:

- The Company would "make a substantial ($400 million) Lump Sum Payment" in response to ALPA's retroactive pay proposals.

- ALPA (through the United and Continental Master Executive Councils) would determine individual pilot allocations for the s-UAL and s-CAL pilot groups.

- The Company would disburse the $400 million payment directly to pilots pursuant to lists stating the dollar amount that each pilot would receive under the agreed upon allocation methodologies.

SOF ¶¶ 16-18, 22, 24, 32.

On November 5, 2012, Arbitrator Ira Jaffe issued a 26-page Decision and Award, resolving a dispute between the two pilot groups over allocating the $400 million payment between them. SOF ¶¶ 24-25. Jaffe awarded $175 million to the Continental pilot group and the remaining $225 million to the United pilot group. SOF ¶ 25.

On December 18, 2012, the Company entered into a new collective bargaining agreement with ALPA known as the "United Pilot Agreement," which set forth the new terms and conditions of employment for the combined group. SOF ¶ 10. The United Pilot Agreement included 26 Letters of Agreement. SOF ¶ 11. As discussed below, the United and Continental Master Executive Councils developed allocation methodologies for disbursing their respective shares of the $400 million payment, and attached those methodologies to Letter of Agreement 24 ("LOA 24"). SOF ¶¶ 27-28.

Upon receiving the pilot specific payment information from ALPA, the Company began disbursing the $400 million to eligible pilots. SOF ¶ 32. The Company withheld federal and applicable state and local taxes on wages, and reported the disbursements as wages on each pilot's W-2 form. SOF ¶ 42.

## B.     Allocation Methodology

As memorialized in Exhibit C to LOA 24 (titled: "CAL Lump Sum Payment Distribution"), the Continental Master Executive Council allocated its $175 million share based on the earnings and availability of Continental pilots during the Relevant Time Period. SOF ¶¶ 29-31; LOA 24, Exhibit C ¶ A. The Council split the $175 million into two equal portions: the "Earnings Portion" and the "Availability Portion." SOF ¶ 33; LOA 24, Exhibit C ¶ A. The Earnings Portion equals a pilot's wages during the Relevant Time Period relative to the wages earned by all pilots during that Period. SOF ¶ 33 (citing LOA 24, Exhibit C ¶ C(1)(a)). The Availability Portion equals the number of "Bid Periods" (which each approximates one calendar month) in the Relevant Time Period in which a pilot earned any wages relative to the total number of Bid Periods for all pilots in that Period. SOF ¶ 33 (citing LOA 24, Exhibit C ¶ C(1)(b)). A pilot who was on unpaid leave, including military leave, and who thus had no "Considered Earnings" in a Bid Period, did not receive credit for either the Earnings Portion or the Availability Portion with respect to that Bid Period. SOF ¶¶ 34-35.

Though summarized above, this Court quotes the relevant terms from Exhibit C to LOA 24 for completeness:

*Availability Amount.*    Paragraph C(1)(b) of Exhibit C defines how to calculate a pilot's share of the Availability Portion:

> Availability Amount.   Each Eligible Pilot's share of the Availability Portion of each tranche of the Continental Pilot Amount will be equal to the ratio that the total number of the individual Eligible Pilot's Eligible Bid Periods bears to the aggregate Eligible Bid Periods of all Eligible Pilots.  (For example, if an Eligible Pilot has a total of 40 Eligible Bid Periods and the aggregate Eligible Bid Periods of all Eligible Pilots are 200,000 then the individual Eligible Pilot will receive .02% (40/200,000) of the Availability Portion of each trance.)

SOF ¶ 33 (citing LOA 24, Exhibit C ¶ C(1)(b)).

*Eligible Bid Period.*  The defined term "Eligible Bid Period," which is used in Paragraph C(1)(b) of Exhibit C, means:

> Eligible Bid Period:  Any bid period during the Relevant Time Period in which the Pilot received any Considered Earnings.

LOA 24, Exhibit C ¶ B(10).

*Considered Earnings.*  The defined term "Considered Earnings" means:

> Considered Earnings:   Considered Earnings includes base pay, sick pay, vacation pay, overrides, and premiums during the Relevant Time Period, but excludes expense reimbursement, per diem, profit sharing payments, on-time award payments, pension payments, imputed income, or other similar awards or allowances during the Relevant Time Period. …

LOA 24, Exhibit C ¶ B(6).

*Unpaid Leave of Absence.*    Excluded from Considered Earnings is a Continental pilot's unpaid leaves of absence, which includes military leave:

> Unpaid Leave of Absence.   Pilots on unpaid leaves of absence, including Voluntary Leaves, Military Leaves or other unpaid absence, at any point during the Relevant Time Period do not have Considered Earnings or Eligible Bid Periods while on such leave, but are entitled to the distribution of both the Earnings Portion and the Availability

Portion of the Continental Pilots Amount, to the extent that they have Considered Earnings or Eligible Bid Periods before and/or after the period of leave.

SOF ¶ 34 (citing LOA 24, Exhibit C ¶ D(3)).

## C. Dispute Resolution Process

Also in LOA 24, ALPA and the Company agreed to have ALPA's Administrative Manual's dispute resolution procedures govern disputes about how United and Continental allocated their shares of the $400 million payment. SOF ¶¶ 23, 36 (quoting and citing LOA 24 ¶ 3(B)). Paragraph 3(B) states in relevant part:

> The United MEC will determine the methodology for allocation of the United Pilot Amount among United Pilots and this allocation methodology, once determined, will be attached as Exhibit B hereto. The Continental MEC will determine the methodology for allocation of the Continental Pilot Amount among Continental Pilots and this allocation methodology, once determined, will be attached as Exhibit C hereto. The allocation methodologies in Exhibit B and Exhibit C will be subject to the dispute resolution provisions of Section 20, Part 3.J of the Association's Administrative Manual ....

SOF ¶ 23 (quoting LOA 24 ¶ 3(B)).

Exhibit C to LOA 24 reaffirmed that ALPA's Administrative Manual's dispute resolution procedures would govern such disputes. SOF ¶ 36 (citing LOA 24, Exhibit C ¶ F). Section F states in relevant part:

> <u>Disputes Over Allocation Methodology</u>. Any dispute raised by a Pilot over the allocation methodology set out in this Exhibit C shall be subject to resolution between the Pilot and ALPA under the dispute resolution provisions of Section 40, Part 3, Paragraph J of ALPA's Administrative Manual.

LOA 24, Exhibit C ¶ F.

Under ALPA's Administrative Manual's dispute resolution procedures, a Continental pilot first had to challenge Continental's allocation methodology before the ALPA Executive Council (an ALPA governing body of elected pilots from various ALPA-represented airlines which represents all ALPA pilots). SOF ¶ 37; ALPA Administrative Manual § 40(3)(J) ¶¶ 4-7. With the ALPA Executive Council's approval, a losing pilot then could appeal to a neutral arbitrator. SOF ¶ 37; ALPA Administrative Manual § 40(3)(J) ¶¶ 8-9.

Here, Plaintiff commenced a formal protest under ALPA's Administrative Manual's dispute resolution procedures through a January 7, 2013 letter to ALPA's Vice President of Administration, Captain Bill Couette. SOF ¶ 38 (citing the 1/7/13 Letter). In the letter, Plaintiff argued, as here, that Continental's allocation formula violated USERRA by excluding military leave periods. SOF ¶ 38 (citing the 1/7/13 Letter). Having commenced this lawsuit one month later (February 8, 2013), Plaintiff emailed Captain Couette on February 21, 2013, attaching the initial Complaint, asking that the Complaint be included in the forthcoming hearing and stating his belief that he was "not bound by any contractual or grievance process." SOF ¶ 38 (citing the 2/21/13 Email).

On February 28, 2013, Plaintiff appeared before the ALPA Executive Council for his hearing, where he argued that the exclusion of military leave periods from the Availability Portion of Continental's allocation methodology violated USERRA. SOF ¶ 38. Other pilots raised the same USERRA objection. SOF ¶ 38.

The next day, March 1, 2013, the ALPA Executive Council issued a decision upholding Continental's allocation methodology and rejecting the USERRA objections. SOF ¶¶ 38-39. The Executive Council found that the $400 million payment was not protected under USERRA for two reasons. The payment either was (1) wages or (2) a non-seniority benefit that is treated the same as comparable unpaid leaves:

> With respect to whether the [Military Leave] Exclusion violates USERRA, because the Retro/Lump Sum Payment is either wages or a non-seniority based benefit and military leave under the challenged Continental MEC allocation methodology is treated the same as comparable unpaid leaves and furlough time, the Executive Council concludes that—assuming for these purposes that USERRA applies to union allocation decisions, such as here—the Continental MEC was not legally required by USERRA to provide credit for any portion of a month that a pilot was on military leave, and upholds the [Military Leave] Exclusion as not in violation of USERRA.

SOF ¶ 39 (citing Executive Council Resolution, AI #3). The ALPA Executive Council authorized pilots objecting to its ruling to appeal to a neutral arbitrator, and several s-CAL military leave pilots did in fact appeal. SOF ¶ 40. Plaintiff did not appeal, SOF ¶ 40, but instead continued with this lawsuit.

In the subsequent arbitration without Plaintiff, Arbitrator Richard Bloch issued a 29-page Opinion on May 21, 2013. The Opinion, in relevant part, affirmed the two bases for the ALPA Executive Council's decision that Continental's allocation methodology did not violate USERRA. SOF ¶ 41. Bloch wrote:

> ALPA bases its actions on [military leave] pilots' unpaid status and observes that, therefore, they are being treated in the same fashion as any other employee on an unpaid leave.
>
> That position has merit. As noted earlier, it was not unreasonable for ALPA to consider the $400 million lump sum payment, whether

characterized as "Retro Pay," "Back Pay" or otherwise, as wage related makeup payments, and to have tied eligibility for, and calculation of, allocation payments to one's being in a paid status during the relevant time periods. The record is clear and the premise is undisputed: Pilots on certain types of Military Leave … are in an unpaid status and, under the allocation methodologies of both the United and Continental MECs, the rule excluding them from receiving RP Hour credit for any portion of the Retro Pay Period or Relevant Period means they are treated in the same manner as any other pilot on an unpaid leave.

SOF ¶ 41 (quoting the 5/21/13 Bloch Opinion).

### D. B-Plan and Military Leave Verification Process

Prior to the merger, Continental maintained an ERISA-governed money purchase defined contribution pension plan known as the Continental Pilots Defined Contribution Plan (or "B-Plan," for short), which remained in effect for s-CAL pilots for a period following the merger and at all times when Plaintiff took military leave. SOF ¶¶ 55-56. The ALPA-Continental CBA incorporated the B-Plan. SOF ¶ 57. The B-Plan required Continental to make pension plan contributions at a level equal to a percentage of a pilot's individual "compensation," and described how to calculate contributions owed thereunder. SOF ¶ 58.

The ALPA-Continental CBA also provided that for pilots returning from military leave, Continental would make whatever past due pension plan contributions were required under the law. SOF ¶ 61. For those pilots, Continental, in a March 13, 2007 Pilot Bulletin, committed to calculate the past due pension plan contributions based on a look-back average of earnings over the 12-month period of "Active Status" preceding the military leave period. SOF ¶ 62. The March 13, 2007 Pilot Bulletin states in relevant part:

> … the Company will calculate a "daily rate" based on the average
> Compensation per day that the pilot earned during his previous 12
> months of Active Status (that is, we will not count the months during
> which the pilot was on Military Leave for the entire bid period as "zero
> income" months, and we will look back to include an entire Active
> Status month during which he had no Military Leave to use in the
> average). The calculated "daily rate" will be multiplied by each day of
> Military Leave that is verified in the process described below,
> providing the pilot with Deemed Compensation to be used solely for
> the purpose of calculating the pilot's B-Plan contribution for his
> Military Leave period.

SOF ¶ 62 (quoting the 3/13/07 Pilot Bulletin).

To receive contributions for military leave periods, a Continental pilot had to submit documentation verifying his military leave. To verify military leave, Continental, in the same March 13, 2007 Pilot Bulletin, required a copy of the pilot's military pay records. SOF ¶ 44. The Bulletin states in relevant part:

> In order to verify Military Leave, pilots with Military Leave on their
> schedules must bring a copy of their military pay records to the Chief
> Pilot's office at their pilot base, denoting the dates of military service
> that correspond to the dates of their Military Leave.

SOF ¶ 44 (quoting the 3/13/07 Pilot Bulletin). Despite the mandatory language "must bring a copy of their military pay records" in the March 13, 2007 Pilot Bulletin, the Company's Base Business Manager Ida Olivera testified that, in practice, Continental accepted a wide variety of documents to verify a pilot's dates of military service. SOF ¶ 45. Once Continental verified the pilot's military leave and so marked the leave in its computer system, Continental's Benefits Department made the requisite B-Plan contributions at a later date. SOF ¶¶ 46-47.

## III.  Analysis

In Counts I to V of his operative Third Amended Complaint, Plaintiff alleges that one or more Defendants violated USERRA (Counts I to III) and related state laws (Counts IV and V) in multiple ways.  In Subsections A to E below, this Court addresses each count in turn.

### A.  Count I: Retro Pay (Against UCH, Continental and ALPA)

In Count I, Plaintiff alleges that UCH, Continental and ALPA, in violation of USERRA's anti-discrimination provisions, 38 U.S.C. §§ 4311 and 4312, omitted his military leave periods from the formula used to calculate his Availability Portion of Continental's $175 million share of the $400 million payment.  Defendants do not dispute that this omission occurred, but instead argue that USERRA does not cover the $400 million payment at all (Subsection 1); and, even if it did, Plaintiff is bound by Bloch's May 21, 2013 decision finding no statutory violation (Subsection 2). Neither argument has merit at this stage of the proceedings.

#### 1.  Characterization of the $400 Million Payment

Defendants argue that USERRA does not cover the $400 million payment because the payment was a wage-related makeup payment.  Plaintiff responds that USERRA covers just the Availability Portion of Continental's $175 million share because, unlike the Earnings Portion, the Availability Portion compensated Continental pilots for underfunded pension contributions during the Relevant Time Period.

USERRA does not require employers to pay service members their wages during military leave periods. 20 C.F.R. § 1002.7(c). Section 1002.7(c) expressly states: "USERRA does not require an employer to pay an employee for time away from work performing service." *See also Miller v. City of Indianapolis*, 281 F.3d 648, 650 (7th Cir. 2002) (finding that USERRA "does not expressly require paid military leave"). USERRA, though, requires employers to provide certain "benefits" to returning service members, including "rights and benefits under a pension plan." 38 U.S.C. § 4303(2).

Neither party cites any case law addressing the exact issue here. Guidance nonetheless can be found from related cases determining whether benefits are seniority based or not. In this context, the Supreme Court has instructed that this Court should uncover the benefit's "real nature." *E.g.*, *Alabama Power Co. v. Davis*, 431 U.S. 581, 588 (1977) (internal quotations omitted); *Accardi v. Pennsylvania Railroad Co.*, 383 U.S. 225, 230 (1966). This guidance flows from the two bedrock principles governing the interpretation of USERRA and its predecessors: (1) service members should return to work at the "precise point" they would have occupied absent military service; and (2) the statutes should be liberally construed for their benefit. *Alabama Power*, 431 U.S. at 584-85. These principles survive in USERRA. 38 U.S.C. § 4301(a) (titled: "Purposes; sense of Congress"); H.R. Rep. 103-65(I), at 19 (1993) (adopting *Alabama Power* for USERRA); S. Rep. 103-158, at 40 (1993) (same); *DeLee v. City of Plymouth, Indiana*, 773 F.3d 172 (7th Cir. 2014) (applying the principles from *Accardi* and *Alabama Power* to USERRA). And these

controlling principles apply equally to the characterization of the $400 million payment as wages or benefits.

Similar to here, in *Accardi*, 383 U.S. at 227, the union and railroad carrier reached a compromise. The union acquiesced to the railroad carrier abolishing the position of fireman on all diesel tugs in exchange for the carrier making severance payments to displaced employees. *Id.* The severance payment amount turned on the displaced employee's length of "compensated service," that is, the number of months the employee had worked at least one day. *Id.* at 227-28. Despite the ostensible link to work performed, as here, the Court found that the severance payments were a seniority benefit under the Selective Training and Service Act, so it was unlawful for the railroad carrier to exclude a displaced employee's military leave from the formula for "compensated service." *Id.* at 230. Instructive for the resolution of this matter, the Court, in uncovering the "real nature" of the severance payments, examined the purpose of the severance payments, explaining that the cost to an employee losing his job is not measured by the number of hours worked but rather by the rights and benefits the displaced employee would forfeit going forward. *Id.* Those rights and benefits increased with seniority. *Id.*

Following the Supreme Court's guidance, this Court finds that disputed issues of material fact exist as to whether the real nature of the $400 million payment includes a pension plan contribution component. The following evidence shows, by way of example, that the payment's purpose may include a pension plan contribution component.

First, in the negotiations underlying the United Pilot Agreement, ALPA sought retroactive payments for pilots to compensate them for not receiving pay and benefit increases during the Relevant Time Period (that is, from the amendable date of the ALPA-Continental CBA until the United Pilot Agreement became effective). During that time, Continental pilots had not received an increase in their contractual hourly rates of pay or their B-Plan contribution rate (which rose from 12.75% to 16% under the United Pilot Agreement). SOF ¶ 14.

Second, Term 3.20 of the Agreement in Principle stated that the $400 million payment encompassed an increase in the pension plan contribution rates. Term 3.20 states in relevant part:

> Lump sum $250M payable at DOS, $150M payable upon conclusion and submission to Company of single seniority list, total cost including fringe items *such as any associated DC contribution*) – allocation to be determined by ALPA.

SOF ¶ 18 (emphasis added).

Third, in an effort to maximize its share of the $400 million pie, the Continental Master Executive Council argued during the arbitration proceedings that Jaffe should consider that Continental pilots had been receiving a lower pension plan contribution rate than United pilots. SOF ¶ 26. Confirming consideration of pension plan contribution rates, the Council presented an analysis from ALPA's Economic and Financial Analysis Department, which determined that full retroactive payments for the combined pilot group would approximate $438 million for wages and another $100 million for benefits. 11/5/12 Jaffe Decision and Award at 3.

Fourth, in his November 5, 2012 Decision and Award allocating $175 million to Continental pilots, Jaffe considered the disparity of pension plan contribution rates between pre-merger United and Continental pilots. Jaffe stated at various points in his Decision and Award:

- "… the CAL pilots are entitled to be credited with the full 16% DC Plan contribution rate retroactively on their actual earnings and also the pay needed to bring them up to the terms of the newly negotiated joint collective bargaining agreement."

- "A failure to take the appropriate adjustment to take the DC Plan contribution differential into account would render the comparison between CAL and UAL compensation one of apples and oranges."

- "… the difference in the DC plan contributions must be recognized when calculating retroactive pay."

SOF ¶¶ 19-20; 11/5/12 Decision and Award at 5-6.

Defendants dispute Plaintiff's historical account, but, having reviewed the factual record, this Court concludes that the determination of the truth is for the trier of fact to decide at a later stage.

Defendants also respond that, irrespective of how the $400 million figure was reached, it was paid out as wages and cannot now be transformed into a benefit. Specifically, when disbursing the $400 million payment to individual pilots, the Company reported the disbursements to the IRS as wages. SOF ¶¶ 32, 42. To support this argument, Defendants cite *Mayberry v. United States*, 151 F.3d 855, 857 (8th Cir. 1998), and *Hemelt v. United States*, 122 F.3d 204, 206, 210 (4th Cir. 1997). Both cases found that settlement awards were wages for federal tax purposes even though the underlying injuries involved non-taxable benefits: the

denial of pension benefits. Defendants also cite numerous cases finding that back pay constitutes taxable wages.

The tax classification of the $400 million payment, however, does not control the classification under USERRA. In *Alabama Power*, 431 U.S. at 593 n.16, the Supreme Court rejected this very argument. Pensions were not wages under the Military Selective Service Act just because a different statute (there, the National Labor Relations Act) classified them as such. *Id.* This conclusion is sound and controls.

Consider, for example, an employer that had underpaid pension plan contributions, yet later reached a settlement agreeing to pay the past due difference. As Defendants would have it, the taxable status of the settlement in this hypothetical would transform the settlement into wages not protected under USERRA. As a result, service members would lack any statutory claim to the settlement proceeds even though they would have received full pension plan contributions in the absence of the employer's misconduct.

Also undermining Defendants' argument, USERRA provides multiple examples of "benefits" that are presumably taxable and would be reported on W-2 forms, including bonuses and severance pay. 38 U.S.C. § 4303(2). The IRS taxing pilots for the $400 million payment thus is not instructive to the instant dispute.

Having found triable issues of material fact as to whether the $400 million payment is a "benefit," this Court considers Defendants' next argument that the payment is a non-seniority benefit that is not entitled to protection under USERRA.

Under 38 U.S.C. § 4316(a), service members are entitled to benefits "determined by seniority" when reemployed after military leave. "Seniority" means "longevity in employment together with any benefits of employment that accrue with, or are determined by, longevity in employment." 20 C.F.R. § 1002.5(k). To determine if a particular benefit is seniority based, this Court, according to USERRA's implementing regulations, should consider three factors:

1. Whether the benefit is a reward for length of service rather than a form of short-term compensation for work performed;

2. Whether it is reasonably certain that the employee would have received the benefit had he remained continuously employed during the period of service; and

3. Whether it is the employer's actual custom or practice to provide or withhold the right or benefit as a reward for length of service.

20 C.F.R. §§ 1002.212(a) to (c).

Although not expressly employing the Section 1002.212 framework, the Seventh Circuit has emphasized the first two factors, finding that the "crucial factor" for determining whether a benefit is seniority based or not is the "true nature" of the benefit—not the formula by which the benefit is calculated (because even the most traditional kinds of seniority benefits can be ostensibly tied to a work requirement). *DeLee*, 773 F.3d at 178, 181. Even when considering the formula, telling is whether the benefit tracks work performed or if the two are only loosely correlated. *Id.* at 176-77.

In *DeLee*, the City of Plymouth passed an ordinance paying its police officers "longevity pay" after each work anniversary, calculated by multiplying $225 by the number of years the officer had worked. *Id.* at 173. The City eventually revised the

ordinance and began prorating the bonus "based on the number of months of actual active duty." *Id.* at 173-74. As a result, the service member in *DeLee*, who had been on military leave for 7 months and 19 days, received a prorated bonus for just the four full months of active duty he completed that year. *Id.* at 180. The City of Plymouth, in other words, discounted the service member's longevity pay by 8/12. *Id.*

In finding that the longevity pay was a seniority benefit under USERRA, the Seventh Circuit analyzed the ordinance's purpose and how the City prorated longevity pay. *See id.* at 178-81. According to the ordinance's preamble, longevity pay was a reward for length of service and not compensation for work performed. *Id.* at 178-80. The rough estimate used by the City of Plymouth to prorate longevity pay (8/12 and not the exact number of days missed) confirmed that longevity pay was not compensation for work performed. *Id.* at 180. Had longevity pay been compensation for work performed, then City of Plymouth officers should have received additional pay for overtime and, conversely, they should have had their longevity pay deducted when they missed significant time from work, such as for jury duty and sick time. *Id.*

As in *DeLee*, here, the history underlying the $400 million payment and the formula used to calculate the Availability Portion create various triable issues of material fact involving whether the payment was a seniority benefit or not. As shown above, there is a factual dispute whether the $400 million payment was intended in part to compensate Continental pilots for almost four years of low

19

pension plan contribution rates.  There is no dispute, of course, that pension plan contributions are a "benefit."  *See* 38 U.S.C. § 4303(2) (defining "benefit" to include "rights and benefits under a pension plan").

The Availability Portion formula, moreover, confirms that, just like the City of Plymouth's ordinance, the $400 million payment was not really compensation for work performed.  The Availability Portion is based on the number of Bid Periods that a pilot had any Considered Earnings.  *See* LOA 24, Exhibit C ¶ C(1)(b) (stating the "Availability Portion" criteria).  A pilot thus had Considered Earnings in a Bid Period irrespective of how many hours he actually worked during the Bid Period—1 hour, 10 hours, 100 hours or more.  Thus, the Availability Portion, unlike the Earnings Portion, did not strictly depend on the amount of work performed.

Even if the $400 million payment was a non-seniority benefit, Defendants still cannot prevail at this stage.  Under 38 U.S.C. § 4316(b)(1)(B), a service member is entitled to non-seniority benefits once reinstated if the employer provides the same benefits to "employees having similar seniority, status, and pay who are on furlough or leave of absence."  If the non-seniority benefits vary according to the type of leave, then the service member must receive "the most favorable treatment accorded to any comparable form of leave."  20 C.F.R. § 1002.150(b).  To determine if two types of leave are comparable, the duration of the leave "may be the most significant factor to compare."  *Id.*  Also instructive are the "purpose of the leave and the ability of the employee to choose when to take the leave."  *Id.*

Here, the parties agree that Considered Earnings include both time spent on jury duty and sick leave. *See* ALPA-Continental CBA § 26(C)(1) (affording pay to pilots on jury duty); LOA 24, Exhibit C § B(6) (defining "Considered Earnings"). The parties dispute whether jury duty and sick leave are comparable to military leave, and there is conflicting case law whether jury duty and sick leave are comparable to military leave in general.

In the seminal case *Waltermyer v. Aluminum Co. of America*, 804 F.2d 821, 821-22, 825 (3d Cir. 1986), a majority panel of the Third Circuit found that a service member was entitled to holiday pay during his annual two-week military leave because the union contract granted holiday pay to absent employees performing jury duty, testifying in court and taking sick leave. Common to all was the absent employee's lack of choice and the "short" duration of the various leaves in general. *Id.* at 825. The Third Circuit thus reversed the district court, which had granted the employer's summary judgment motion and denied the service member's cross-motion. *Id.* at 822, 825-26.

For the same reasons, the Court in *Brill v. AK Steel Corp.*, No. 09-534, 2012 WL 893902, at *6 (S.D. Ohio March 14, 2012), denied the employer's summary judgment motion, finding that military leave and jury duty have comparable durations. In that case, the service member's military leave periods generally lasted no more than four weeks (one to five days for weekend drills and funeral duty, and two to four weeks for annual training), although he also took two leaves of approximately one year each when deployed. *Id.* at *1 & n.2.

By comparison, in *Tully v. Department of Justice*, 481 F.3d 1367, 1368-70 (Fed. Cir. 2007), the Federal Circuit distinguished *Waltermyer* and found that the service member there was not entitled to holiday pay while away on active duty for two-and-a-half years. Although the employer gave holiday pay to employees who took leaves of absences to attend court proceedings as jurors or witnesses, those forms of leave were of far shorter duration and thus were not comparable to a two-and-a-half year military leave. *Id.* at 1369-71.

*Waltermyer* and *Brill* reached a different outcome than *Tully* based upon their differing understanding of the typical duration of military leave, as informed by their respective fact patterns. In *Waltermyer*, 804 F.3d at 821-22, 825, the service member took a two-week leave for his annual military training and the majority, in comparing military leave to jury duty and sick leave, described the duration of military training as "short." The majority reached this conclusion in the face of a dissent disagreeing with this characterization:

> We note that the majority finds it particularly significant that reservists' absences are short. I do not think that this is either important or supportable. As the Supreme Court recognized in *Monroe*, absences caused by reserve obligations can be two months or more.

*Id.* at 827 n.3 (Hunter, J., dissenting) (internal citations omitted). In *Brill*, 2012 WL 89390, at *1, 6, the service member took repeated military leaves, but they almost always were four weeks or less (although there were two longer leaves of approximately one year each). The single absence in *Tully* was far longer than any

single absence in *Waltermyer* and *Brill*—two-and-a-half years. There were no short term absences in *Tully*.

Here, this Court finds the majority opinion in *Waltermyer* and *Brill* more persuasive than *Tully*, thereby concluding that the typical duration of military leave is comparable to jury duty and sick leave. Although military leave can last months or years, such as when a service member is deployed, the typical leave is just days or weeks, as confirmed by Plaintiff's own military leave during 2008 (before he was deployed for longer periods). The below table shows the total number of days Plaintiff took for military leave in each month in 2008.

| 2008 Military Leave | |
| --- | --- |
| **Month** | **Days of Leave** |
| January | 3 |
| February | 25 |
| March | 3 |
| April | 0 |
| May | 0 |
| June | 0 |
| July | 0 |
| August | 3 |
| September | 4 |
| October | 11 |
| November | 11 |
| December | 6 |

*See* PSOF ¶ 43 (citing Plaintiff's Military Leave Verification at UNITED 002220-21).

Defining the duration of military leave by the chance of a multi-year deployment, as Defendants read *Tully*, narrows the range of comparable leaves in a way Congress did not intend. Reading both the text and the context of the operative

language, this Court notes here that the House and Senate Reports accompanying USERRA, and the official commentary to the statute's implementing regulations, all cited the majority opinion in *Waltermyer* with approval.  H.R. Rep. 103-65(I), at 33-34 (1993); S. Rep. 103-158, at 58 (1993); 70 Fed. Reg. 75,262-64 (Dec. 19, 2005). Congress could have adopted, but did not, the dissenting opinion in *Waltermyer*, which echoes *Tully*.  In any event, if outliers are considered, then jury duty and sick leave also can last months in certain cases.

Beyond duration, Defendants argue that jury duty differs from military service because Section 26(C)(1)(b) of the ALPA-Continental CBA requires pilots who receive a jury duty summons to cooperate fully in seeking to be excused from jury duty or requesting a deferral when deemed "operationally necessary" by the company.   This argument is unpersuasive.   Not only is the scope of Section 26(C)(1)(b) narrow (employing the restrictive language: "operationally necessary"), but also the ALPA-Continental CBA cannot deny the compulsory nature of jury service, and the lack of choice to attend from the employee's perspective.   The government, not Continental, compels appearance for jury service as part of an individual's civic duty to their country, and only the government decides when an excusal or deferral is warranted.

Defendants also argue that sick leave has a different purpose (that is, compensation for past work) than military leave.   The purpose of sick leave is certainly one factor this Court must consider, *see* 20 C.F.R. § 1002.150(b), but, in light of the other ways sick leave and military leave are comparable, this Court does

not find their differing purpose to be dispositive.  As with military leave and jury duty, falling sick and being forced to take sick leave is beyond the employee's control and can last just as long.  For all of these reasons, there are triable issues of material fact as to whether part of the $400 million payment is a protected "benefit" under USERRA.

## 2. Arbitration

Defendants next argue that Plaintiff had to arbitrate his USERRA claim in accordance with ALPA's Administrative Manual's dispute resolution procedures, as other pilots did.  Because Plaintiff failed to do so, Defendants now argue that Plaintiff is bound by Bloch's May 21, 2013 Opinion.  Plaintiff responds that an employer cannot mandate arbitration of USERRA claims under any circumstances and, even so, the United Pilot Agreement did not include a "clear and unmistakable" arbitration mandate.

To begin, there is conflicting authority whether USERRA precludes compulsory arbitration, *see* The USERRA Manual § 8:15 (2015) (laying out the competing sides of the debate), but this Court need not choose sides at this time because, even if an agreement to arbitrate USERRA claims is enforceable in theory, the arbitration language here is not sufficiently specific to compel arbitration of Plaintiff's USERRA claims.

Agreements to arbitrate statutory claims in collective bargaining agreements must be in "clear and unmistakable" terms before an employee will be deemed to have waived his right to redress in court.  *14 Penn Plaza LLC v. Pyett*, 556 U.S. 247,

254-55, 258-60, 272-74 (2009). To satisfy the "clear and unmistakable" requirement, the collective bargaining agreement must, at a minimum, (1) identify the specific statute the collective bargaining agreement purports to incorporate somewhere in the agreement, or (2) include an arbitration clause that explicitly encompasses the statutory claim. *Gilbert v. Donahoe*, 751 F.3d 303, 309 (5th Cir. 2014); *Ibarra v. United Parcel Service*, 695 F.3d 354, 359-60 (5th Cir. 2012) (surveying cases from the First, Fourth and Ninth Circuits). The Seventh Circuit has not yet construed the "clear and unmistakable" requirement from *14 Penn Plaza*.

Nevertheless, two cases supply instructive examples of the "clear and unmistakable" requirement. First, in *Gilbert*, 751 F.3d at 309, the collective bargaining agreement required the arbitration of "grievances," meaning:

> … a dispute, difference, disagreement or complaint between the parties related to wages, hours and conditions of employment. A grievance shall include, but is not limited to, the complaint of an employee or of the Union which involves the interpretation, application of, or compliance with the provisions of this Agreement ....

The collective bargaining agreement in *Gilbert* also included two anti-discrimination clauses. One clause prohibited discrimination under the Rehabilitation Act: "consistent with the other provisions of this Agreement, there shall be no unlawful discrimination against handicapped employees, as prohibited by the Rehabilitation Act." *Id.* at 309-10. Another clause supplied "policies to comply with the [FMLA]." *Id.* at 310 (brackets in original).

In interpreting this language, the Fifth Circuit found that the collective bargaining agreement required arbitration of the employee's Rehabilitation Act claim but not his Family and Medical Leave Act ("FMLA") claim. *Id.* The Court emphasized the different ways the agreement identified each claim. *Id.* The agreement expressly incorporated the Rehabilitation Act, but only provided policies to comply with the FMLA. *Id.*

Second, in *Chicago Regional Council of Carpenters v. Unique Casework Installations, Inc.*, No. 14-2911, 2014 WL 6980723, at *1 (N.D. Ill. Dec. 9, 2014), the collective bargaining agreement included an arbitration clause covering "any dispute concerning the proper interpretation and application" of the agreement. This language, according to the Court, did not expressly mention employment discrimination or other statutory claims, so the arbitration clause did not require arbitration of a Title VII race discrimination claim. *Id.* at *3-4.

Other decisions in this Circuit track *Gilbert* and *Chicago Regional Council of Carpenters. E.g.*, *St. Aubin v. Unilever HPC NA*, No. 09-1874, 2009 WL 1871679, at *4 (N.D. Ill. June 26, 2009); *Barnes v. Hartshorn*, No. 09-2299, 2010 WL 3540919, at *2, 5 (C.D. Ill. July 15, 2010). By comparison, Defendants cite *Jensen v. Calumet Carton Co., Inc.*, No. 11-2785, 2011 WL 5078875 (N.D. Ill. Oct. 25, 2011), but that case is not persuasive. The Court in *Jensen* granted a motion to compel arbitration of the employee's Title VII hostile work environment claim. Although the collective bargaining agreement did not "specifically reference Title VII or violations of federal law," the Court nonetheless reasoned that the employee had "not cited any

controlling Seventh Circuit precedent since *14 Penn Plaza LLC* that requires such specific details in order to satisfy the standard in that case." *Id.* at *3. That four-year-old observation is no longer compelling in light of the aforementioned, intervening case law from multiple circuits.

Here, the United Pilot Agreement does not include a "clear and unmistakable" requirement that USERRA claims be arbitrated. Defendants have not pointed to any part of the Agreement that incorporates USERRA, and none of the arbitration clauses expressly includes statutory claims. *See* SOF ¶ 23 (citing LOA 24 ¶ 3(B) which sets forth the arbitration procedure under LOA 24); LOA 24, Exhibit C ¶ F ("Disputes Over Allocation Methodology").

In a final passing paragraph, Defendants cite *Gvozdenovic v. United Air Lines, Inc.*, 933 F.2d 1100 (2d Cir. 1991), arguing that Plaintiff cannot reverse course and challenge Bloch's May 21, 2013 Opinion, having invoked ALPA's Administrative Manual's dispute resolution procedures, lost at the first step and abandoned the process altogether. This is ostensibly a waiver argument.

Waiver is the "voluntary and intentional relinquishment or abandonment of a known existing right or privilege." *Molina v. First Line Solutions LLC*, 566 F. Supp. 2d 770, 782 (N.D. Ill. 2007) (quoting Seventh Circuit case law). When determining if a party has waived its challenges to the arbitral outcome, this Court must determine whether that party objected to the arbitration before receiving an adverse arbitration ruling.

The United flight attendants in *Gvozdenovic* did not raise a timely objection. As the Second Circuit emphasized, the record there, unlike the one here, contained "no evidence" that the flight attendants had objected to arbitration before or during the process. *Gvozdenovic*, 933 F.2d at 1104. Instead, the flight attendants were active participants who only challenged the arbitration agreement in court after the arbitrator had rendered an adverse ruling. *Id.*

By comparison, both *Proshred Holdings Ltd. v. Conestoga Document*, No. 02-1551, 2002 WL 1067328 (N.D. Ill. May 28, 2002), and *Application of Herman Miller, Inc.*, No. 97-7878, 1998 WL 193213 (S.D.N.Y. April 21, 1998), distinguished *Gvozdenovic* and permitted challenges in court because there had not yet been any arbitral rulings at the time the employees brought suit. Additionally, waiver did not result from the employees having participated in preliminary arbitration proceedings. In *Proshred Holdings*, 2002 WL 1067328, at *2, 5-6, the employees had participated in multiple status conferences with the arbitrator and waited more than three years before bringing suit. Likewise, in *Application of Herman Miller*, 1998 WL 193213, at *2-3, the employee requested that the arbitration venue be moved, submitted a list of proposed arbitrators and participated in a hearing to choose arbitration dates.

As in *Proshred Holdings* and *Application of Herman Miller*, here, Plaintiff did not wait for an arbitral ruling before suing. More compelling than those cases, Plaintiff commenced this lawsuit just one month after invoking ALPA's Administrative Manual's dispute resolution procedures. Before any hearing was

held, Plaintiff asked the Company to include his Complaint in the hearing and stated his belief that he was "not bound by any contractual or grievance process." SOF ¶ 38 (citing Plaintiff's 2/21/13 email). Plaintiff never invoked arbitration, let alone stop the arbitration process once it had started, as was the case in *Proshred Holdings* and *Application of Herman Miller*. SOF ¶ 40. For all of these reasons, Plaintiff had no obligation to pursue arbitration, and, having not volunteered to do so, Plaintiff is not now bound by Bloch's May 21, 2013 Opinion.

### B.      Count II: B-Plan (Against UCH and Continental)

In Count II, Plaintiff alleges that UCH and Continental, in violation of USERRA's anti-discrimination provisions and pension plan protections, 38 U.S.C. §§ 4311, 4312 and 4318, used an unlawful methodology to calculate his B-Plan contributions when he returned from military service. Defendants respond that the March 13, 2007 Pilot Bulletin included a lawful methodology (Subsection 1); and, to the extent that issue is disputed, the Railway Labor Act divests this Court of subject matter jurisdiction (Subsection 2). Once again, neither argument has merit at this stage of the proceedings.

### 1.      Methodology

With respect to the first argument, USERRA requires employers to count military service periods towards a service member's pension plan contributions. 38 U.S.C. § 4318; *see also Crews v. City of Mt. Vernon*, 567 F.3d 860, 867 (7th Cir. 2009) (citing Section 4318). Section 4318(b)(3) permits two methodologies for calculating pension plan contributions when service members return from military

leave.  An employer must use the employee's actual rate of pay unless that rate is

"not reasonably certain."  If so, the employer, as a fallback position, may use the

employee's deemed average rate of pay over the preceding 12 months.  Section

4318(b)(3) states:

> For purposes of computing an employer's liability under paragraph (1)
> or the employee's contributions under paragraph (2), the employee's
> compensation during the period of service described in subsection
> (a)(2)(B) shall be computed—
>
> (A) at the rate the employee would have received but for the period of
> service described in subsection (a)(2)(B), or
>
> (B) in the case that the determination of such rate is not reasonably
> certain, on the basis of the employee's average rate of compensation
> during the 12-month period immediately preceding such period (or, if
> shorter, the period of employment immediately preceding such period).

38 U.S.C. § 4318(b)(3).  There is no dispute that, in the March 13, 2007 Pilot

Bulletin, Continental proceeded under 38 U.S.C. § 4318(b)(3)(B)—not 38 U.S.C. §

4318(b)(3)(A).  *See* SOF ¶ 62 (quoting the 3/13/07 Pilot Bulletin).

To determine whether Continental was allowed to proceed under 38 U.S.C. §

4318(b)(3)(B), this Court must interpret the phrase "not reasonably certain."  If a

variable rate of pay or variable hours alone can satisfy the "not reasonably certain"

predicate, then summary judgment for Defendants may be warranted here.  The

undisputed facts show that Plaintiff's rate of pay was variable, depending upon

numerous factors including:

- the type of plane flown;
- the number of trips;
- the number of hours flown;
- overtime pay;
- international override;
- International Relief Officer Flight Pay;

- the amount of "deadheading"; and
- the trip destinations.

SOF ¶¶ 58-59. USERRA, however, fails to define the phrase "not reasonably certain," so this Court must construe the statute.

Statutory interpretation begins with the plain language of the statute. *United States v. Berkos*, 543 F.3d 392, 396 (7th Cir. 2008). This Court assumes that the purpose of the statute is communicated by the ordinary meaning of the words Congress used; thus, the plain language is conclusive absent any clear indication of a contrary purpose. *United States v. Ye*, 588 F.3d 411, 415 (7th Cir. 2009) (citing *Berkos*, 543 F.3d at 396); *Zeigler Coal Co. v. Director, Office of Workers' Compensation Programs*, 326 F.3d 894, 900 (7th Cir. 2003). To interpret the plain language of the statute, this Court looks to "the specific language at issue, the context in which the language is used, and the broader context of the statute as a whole." *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997). It is appropriate for this Court to employ a dictionary to ascertain the meaning of an otherwise undefined word or phrase in a statute. *See Ye*, 588 F.3d at 415 (employing Webster's New International Dictionary to interpret a statute); *Zeigler Coal*, 326 F.3d at 900 (also employing a dictionary to interpret a statute).

When Congressional intent cannot be ascertained from the plain and ordinary meaning of the statute alone, this Court then is guided by legislative history and other extrinsic materials. *Exxon Mobil Corp. v. Allapattah Services, Inc.*, 545 U.S. 546, 568 (2005). Among such materials, the Seventh Circuit has observed that conference reports, unlike the words of a single representative or

senator, are "often a good record of Congress's intent." *Valero Energy Corp. v. United States*, 569 F.3d 626, 634 (7th Cir. 2009). This Court also may consider federal regulations bearing on the interpretation of the statute. *Silvernail v. Ameritech Pension Plan*, 439 F.3d 355, 358 (7th Cir. 2006); *Visiting Nurses Association of Southwestern Indiana, Inc. v. Shalala*, 213 F.3d 352, 355 (7th Cir. 2000).

Beginning with the plain language of the phrase "not reasonably certain," by qualifying the absolute word "certain," Congress intended for variable rates of pay to be "*reasonably* certain" under certain circumstances. "Reasonable" means "[s]ufficient, adequate, or appropriate for the circumstances or purpose; fair or acceptable in amount, size, number, level, quality, or condition." "Reasonable," Oxford English Dictionary (3d ed. 2009). Read together, "reasonably certain" thus means "sufficiently certain" or "adequately certain." Had Congress intended for Section 4318(b)(3)(B)'s deemed average rate of pay methodology to apply to *all* variable rates of pay, then it would have eliminated any qualification in the statutory language and just written: "not certain."

This Court is further guided by the Supreme Court's guidance that USERRA must be construed for the benefit of service members, *see Alabama Power*, 431 U.S. at 584-85, and H.R. Rep. 103-65(I), at 19 (1993) and S. Rep. 103-158, at 40 (1993) (both citing *Alabama Power* to emphasize this interpretative principle under USERRA); and Congress' intention of "ensuring that a servicemember's pension is the same as if he had not been called to active duty," *Goodman v. City of New York*,

Nos. 10-5236 and 11-3432, 2011 WL 4469513, at *5 (S.D.N.Y. Sept. 26, 2011) (interpreting USERRA's pension plan contribution requirements). Using a deemed rate of compensation over the preceding 12 calendar months, of course, is the fallback position in the statute. The deemed rate of compensation thus is disfavored because it will be less accurate than the actual rate of pay the employee would have earned.

Although this Court can end its statutory analysis with USERRA's plain language, USERRA's conference reports confirm this Court's reading of the phrase "not reasonably certain." The reports show that the phrase "not reasonably certain" means "a high probability," which is less than 100%.

The initial House and Senate versions of what is now 38 U.S.C. § 4318(b)(3)(B) were identical and included the phrase "fixed rate" in place of "reasonably certain":

> (B) if the employee's compensation was not based on a fixed rate, shall be computed on the basis of the employee's average rate of compensation during the 12-month period immediately preceding such period (or, if shorter, the period of employment immediately preceding such period).

H.R. Rep. 103-65(I), at 9 (1993) (quoting Section 4316(b)(3)(B) of H.R. 995); S. Rep. 103-158, at 18-19 (1993) (quoting Section 4317(b)(3)(B) of S. 843). During the merger of the House and Senate bills, Congress adopted a modified version of the House bill, replacing the phrase "fixed rate" with "reasonably certain." The Joint Explanatory Statement on H.R. 995 does not give the reason for this change, but

Congress did state that it was incorporating the definition of "reasonably certain" from pay rate cases:

> Under section 4318(b)(3), for purposes of computing an employer's liability or an employee's contributions, to the extent that they are based on an employee's earnings, the same "reasonable certainty" analysis as is applicable to pay rate cases would be applicable here.

Joint Explanatory Statement on H.R. 995, *reprinted in* 1994 U.S.C.C.A.N. 2493, at 2506-07. Earlier and in the context of a different section (what is now 38 U.S.C. § 4313), the House Report had cited what this Court understands are the so-called "pay rate cases" to define the phrase "reasonable certainty" to mean "a high probability":

> The Committee intends to affirm the interpretation of "reasonable certainty" as "a high probability" (*see Schilz v. City of Taylor, Mich.*, 825 F.2d 944, 946 (6th Cir. 1987)), which has sometimes been expressed in percentages. *See Montgomery v. Southern Electric Steel Co.*, 410 F.2d 611, 613 (5th Cir. 1969) (90 percent success of probationary employees becoming permanent meets reasonable certainty test); *Pomrening v. United Air Lines, Inc.*, 448 F.2d 609, 615 (7th Cir. 1971) (86 percent pass rate of training class meets reasonable certainty test).

H.R. Rep. 103-65(I), at 31 (1993). In sum, Congress intended the phrase "reasonably certain" to mean "a high probability," and a service member can have a "reasonably certain" rate of pay during military leave periods even though that rate is not a "fixed rate."

Defendants point to USERRA's implementing regulation but, as discussed below, neither this extrinsic source nor its accompanying commentary compel the conclusion that an employee's rate of pay is "not reasonably certain" when the hourly rate or the number of hours worked vary. The implementing regulation and

accompanying commentary provide commissions and tips as examples of when the rate of pay is "not reasonably certain." 20 C.F.R. § 1002.267(b)(1) states:

> Where the rate of pay the employee would have received is not reasonably certain, such as where compensation is based on commissions earned, the average rate of compensation during the 12-month period prior to the period of uniformed service must be used.

The Department of Labor's commentary to Section 1002.267 provides tips as another example:

> If that amount cannot be determined with reasonable certainty (for example, where the compensation rate varies based on commissions or tips), the compensation rate may be based on the service member's average compensation rate during the 12-month period before the service period.

70 Fed. Reg. 75,285 (Dec. 19, 2005). Although an employee earning commissions or tips may have a rate of pay that is "not reasonable certain," these sources do not suggest, let alone compel the conclusion, that such wage schemes always are "not reasonably certain." Some variable rates of pay may still be "reasonable certain."

Relying on the commissions example from Section 1002.267 and without conducting a full analysis of the statutory language, one federal court has granted a service member's summary judgment motion, finding that the employer's pension plan contribution methodology violated 38 U.S.C. § 4318. *Hanson v. County of Kitsap*, 21 F. Supp. 3d 1124, 1148 (W.D. Wash. 2014). The service member in *Hanson* was a deputy fire marshal and, in that role, he received overtime and additional pay while on call and also while conducting building investigations. *Id.* at 1129. There was no dispute that the service member's hours fluctuated based on his workload. *Id.* On this record and without conducting an exhaustive statutory

analysis, the Court concluded that, like an employee earning commissions, the service member's pay was "not reasonably certain," so the employer had to proceed under 38 U.S.C. § 4318(b)(3)(B). *Id.* at 1148 (citing 20 C.F.R. § 1002.267).

In light of the plain statutory language and its purpose, the explicit legislative history defining the phrase "reasonably certain" and removing the language "fixed rate," and the absence of any disavowal of that history from the implementing regulation and accompanying commentary, this Court does not read the "reasonably certain" language, or the examples of commissions and tips, as broadly as Defendants would like. The weight of authority thus compels this Court to not end its analysis when there is a variable input in the rate of pay, because that rate nonetheless may be "reasonably certain" (or highly probable) in other ways based upon the circumstances.

Just as a car salesman paid on commission may be able to reasonably forecast his earnings in a month based upon his performance in other months or how his peers performed during the same month, here, Plaintiff argues that his own rate of pay did not fluctuate much from month-to-month and also mirrors the earnings of other pilots who did not take military leave. Defendants disagree, but this is a fact-intensive dispute that cannot be resolved at summary judgment.

For example, in arguing that Plaintiff's rate of pay was variable, Defendants cite a table showing Plaintiff's monthly compensation from January 2008 to January 2009. SOF ¶ 60. In those 13 months, Plaintiff earned an average of $7,692.68 per month, ranging from $912.21 (February 2008) to $12,094.79 (July

2008) and with a standard deviation of $3,069.68. Yet, confounding Defendants'
analysis, the low months of pay are the very months Plaintiff took the most military
leave, such as 25 days of military leave in February 2008. *See* PSOF ¶ 43 (citing
Plaintiff's Military Leave Verification at UNITED 002220-21, which identifies the
dates of Plaintiff's military leave). Expert analysis may clarify this analysis one
way or the other, but, at least at this stage, disputed issues of material fact remain.

Even if the fallback methodology under 38 U.S.C. 4318(b)(3)(B) applies,
Plaintiff argues Continental did not use the "12-month period *immediately*
preceding" the period of uniformed service. Instead, Continental looked back more
than 12 calendar months when an employee was on military leave for an entire Bid
Period. *See* SOF ¶ 62 (quoting the 3/13/07 Pilot Bulletin). Plaintiff explains that
reaching farther back than 12 months harms service members because, assuming
that an employee's rate of pay increases with time, Continental would be bringing
older, lower rates of pay into their calculation of the service member's pension plan
contribution for military leave periods.

Defendants respond that Continental's policy was intended to benefit service
members by excluding times when they earned no income during the Bid Period due
to military service. Although this argument may show that Plaintiff has suffered no
injury (which Defendants do not address in their motion papers), it does not undo
the statutory violation. The plain meaning of the "12-month period *immediately*
preceding" the period of uniform service is the preceding 12 calendar months—not a

longer period of time, regardless of the reason.  38 U.S.C. 4318(b)(3)(B) (emphasis added).

## 2.    Railway Labor Act Preemption

Defendants alternatively argue that, if the March 13, 2007 Pilot Bulletin is ambiguous, then the Railway Labor Act divests this Court of subject matter jurisdiction.  Under the Railway Labor Act, resolving any ambiguity in a collective bargaining agreement is a "minor dispute" relegated to the exclusive jurisdiction of the statute's mandatory grievance and arbitration procedures.  *Brown v. Illinois Central Railroad Co.*, 254 F.3d 654, 658 (7th Cir. 2001).

This argument fails for two reasons.  As a threshold matter, this Court first must determine if USERRA disputes are subject to the Railway Labor Act.  When there is a choice between two federal statutes, this Court must analyze both to determine if they can be harmonized or are incompatible; and, if they are incompatible, this Court must then determine which one Congress meant to take precedence.  *Coker v. Trans World Airlines, Inc.*, 165 F.3d 579, 583-84 (7th Cir. 1999); *accord Brown*, 254 F.3d at 661-62.  Decades ago, the Supreme Court found that the Universal Military Training and Service Act trumps the Railway Labor Act, *see McKinney v. Missouri-Kansas-Texas Railroad Co.*, 357 U.S. 265, 268-70 (1958), and this Court sees no reason to depart from that analysis in light of the continuity of the body of case law interpreting USERRA and its predecessor statutes.  20 C.F.R. § 1002.2; S. Rep. 103-158, at 40 (1993); 70 Fed. Reg. 75,246 (Dec. 19, 2005) (citing Section 1002.2); *Gross v. PPG Industries, Inc.*, 636 F.3d 884,

888 (7th Cir. 2011) (same); *Crews*, 567 F.3d at 864-65 (same). Indeed, the House Report to USERRA cited *McKinney* (and *Kidder*, discussed below) to "reaffirm that additional resort to mechanisms such as grievance procedures or arbitration or similar administrative appeals is not required." H.R. Rep. 103-65(I), at 20 (1993).

*McKinney* did not require service members to pursue the Railway Labor Act's grievance procedures before bringing a Universal Military Training and Service Act claim in court. 57 U.S. at 268-70. The Supreme Court explained that the service member's rights were created by federal statute even though their determination may have necessarily involved interpretation of a collective bargaining agreement. *Id.* The Court further explained that the Universal Military Training and Service Act's statutory scheme contemplated a speedy vindication of rights that was inconsistent with requiring a service member to exhaust other avenues of relief. *Id.* Following *McKinney*, the Court in *Kidder v. Eastern Air Lines, Inc.*, 469 F. Supp. 1060, 1063 (S.D. Fla. 1978), likewise denied an employer's invocation of the Railway Labor Act.

Second, even assuming the Railway Labor Act applies (and it does not), the statute precludes federal claims only if their resolution depends on an interpretation of a collective bargaining agreement. *Brown*, 254 F.3d at 664-66. So long as the parties do not dispute the interpretation of the collective bargaining agreement, or the disputed provisions of the agreement are relevant but not dispositive, then the underlying federal claim is not precluded by the Railway Labor

Act.  *Roslyn v. Northwest Airlines, Inc.*, No. 05-441, 2005 WL 1529937, at *2 (D. Minn. June 29, 2005).

In *Roslyn*, 2005 WL 1529937, at *3, the Court denied defendant Northwest Airline's motion to dismiss, finding that the Railway Labor Act did not preempt the service member's USERRA claim.  The service member was a flight attendant guaranteed 75 hours of flight time and pay per month.  *Id.* at *1-2.  The service member bid for, but did not receive, paid leave days over his military leave periods, so Northwest Airlines docked his pay for those missed days in accordance with the collective bargaining agreement.  *Id.* at *1-2.  Although a collective bargaining agreement governed scheduling, the Court found that the Railway Labor Act did not preempt the service member's USERRA claim, and explained that, as here, the service member was not contesting the interpretation of the agreement but rather alleging that its undisputed scheduling procedures discriminated against him because of his military status.  *Id.* at *3.

As in *Roslyn*, here, the parties dispute the construction of a federal law in the context of a clear contract provision.  The dispute here turns on the scope of the phrase "not reasonably certain" in 38 U.S.C. § 4318(b)(3).  Neither side disputes the interpretation of the March 13, 2007 Pilot Bulletin, as shown above and as Defendants themselves concede in their motion papers:

> To resolve the B-Plan Claim, the Court need only review (*not interpret*) the Continental CBA and related documents to determine (1) whether the compensation Plaintiff would have received under the CBA but for military leave can be determined with "reasonabl[e] certain[ty]" within the meaning of USERRA § 4318(b), and (2) if, as Plaintiff's own

earnings history demonstrates, it cannot, whether Continental's policy complies with § 4318(b)(3)(B).

[161] at 25 (emphasis added and brackets in original).

For these reasons, Defendants' principal case, *Carder v. Continental Airlines, Inc.*, No. 09-3173, 2013 WL 4483104 (S.D. Tex. March 28, 2013), is distinguishable. Although also involving Continental and a USERRA claim that Continental had underpaid B-Plan contributions, the Court in *Carder* found that it would have to interpret the ALPA-Continental CBA, such as to determine how contributions to the B-Plan were made for pilots who did and did not take military leave. *Id.* at *5-6. For that reason, which is not present here, the Court granted Continental's motion to dismiss, finding that the Railway Labor Act preempted the USERRA claims. *Id.* at *5-6. *Calder*, notably, did not answer the predicate question of whether the Railway Labor Act even extends to USERRA after *McKinney*. *See* The USERRA Manual § 8:15 (2015) (criticizing *Calder* for failing to address *McKinney*).

For these two reasons, the Railway Labor Act does not divest this Court of subject matter jurisdiction.

## C. Count III: Verification of Military Leave (Against UCH and Continental)

As part of Count III, Plaintiff alleges that UCH and Continental violated USERRA in four more ways: (1) not accepting certain forms of military leave identification; (2) making untimely pension plan contributions; (3) requiring verification for short-term military leave; and (4) not crediting Plaintiff for travel days. Defendants respond that Plaintiff lacks standing to raise the first allegation

42

and never raised the third and fourth allegations in the Third Amended Complaint. Defendants do not move for summary judgment on the second allegation.

Beginning with the first allegation, under 20 C.F.R. § 1002.121, an employee is required to submit documentation to the employer in connection with an application for reemployment if the military leave period exceeded 30 days and if requested by the employer. The regulations identify a non-exhaustive list of seven types of documentation that are permissible. 20 C.F.R. §§ 1002.123(a) (listing the seven permissible types of documentation) and 1002.123(b) (stating that the "types of documents that are necessary to establish eligibility for reemployment will vary from case to case").

Defendants dispute that they only accepted one form of documentation, *see* SOF ¶ 45, but, in any event, they argue that Plaintiff lacks standing to bring this claim. Defendants explain that Plaintiff never presented verification documentation that they rejected, so he suffered no injury. SOF ¶¶ 45, 48-51. These undisputed facts warrant summary judgment because an injury is a requirement for standing. *Laskowski v. Spellings*, 546 F.3d 822, 825 (7th Cir. 2008). Confirming this outcome, the Court in *Peltier v. Macomb County*, No. 10-10796, 2011 WL 3320328, at *20-21 (E.D. Mich. March 25, 2011), *adopted by*, 2011 WL 4596051 (E.D. Mich. Sept. 30, 2011), found that the service member there lacked standing to bring a USERRA claim because, even if the employer violated the statute, the service member, like Plaintiff here, did not suffer an actual injury.

As for the third and fourth allegations, Plaintiff must plead only enough detail in his Third Amended Complaint to give Defendants fair notice of what the claim is and the grounds upon which it rests. *Tamayo v. Blagojevich*, 526 F.3d 1074, 1083 (7th Cir. 2008). Complaints do not have to identify legal theories or point to the specific statute for relief. *McDonald v. Household International, Inc.*, 425 F.3d 424, 427-28 (7th Cir. 2005). Here, Paragraphs 49 to 51 of the Third Amended Complaint, which are incorporated into Count III, gave Defendants fair notice of his claim that they improperly required verification for short-term military leave:

- **Paragraph 49:** Defendants required "each pilot" upon return to submit Leave Earning Statements to verify periods of military leave.
- **Paragraph 50:** "USERRA requires employees who have been on military leave for 31 days or more to submit documentation for reemployment ...."
- **Paragraph 51:** "There is no requirement under USERRA to provide documentation for military leave periods of less than 31 days."

In contrast, however, this Court also concludes that Plaintiff did not give fair notice of a claim that Defendants failed to credit him for travel days. There is no suggestion of such a claim in the Third Amended Complaint. In reaching this decision, this Court does not prejudge any ruling on a motion to amend to add that allegation, if Plaintiff chooses that path.

### D. Count IV: Violation of California Military and Veterans Code § 394 (Against UCH, Continental and ALPA)

In Count IV, Plaintiff claims that the same discriminatory conduct underpinning his USERRA claim in Count I also violates the California Military

and Veterans Code § 394.[1]  Plaintiff, for instance, argues that "Defendants' motive for … the underpayment of B-Plan and PRAP retirement account contributions, as set forth above, was their participating in National Guard and Military Reserve duty, in violation of § 394."  TAC ¶ 110.  As with USERRA, California Military and Veterans Code § 394 prohibits employers from discriminating against service members in their civilian employment.

In moving for summary judgment, Defendants argues that ERISA preempts Count IV—as well as the state negligence claims in Count V—to the extent these state law claims regard Continental's ERISA-governed B-Plan.  Plaintiff responds that ERISA does not preempt his state law claim because he is not seeking benefits under the terms of the B-Plan, but rather is challenging Defendants' adoption of discriminatory practices.

ERISA § 514(a) preempts state law claims that "relate to" employee benefit plans.  29 U.S.C. § 1144(a).  A state law relates to an employee benefit plan at least when the law:

1. mandates employee benefit structures or their administration;
2. binds employers or plan administrators to particular choices or precludes uniform administrative practice, thereby functioning as a regulation of an ERISA plan itself; or
3. provides an alternative enforcement mechanism to ERISA.

*Trustees of AFTRA Health Fund v. Biondi*, 303 F.3d 765, 775 (7th Cir. 2002) (analyzing *New York State Conference of Blue Cross & Blue Shield Plans v.*

---

[1] Because the same allegations in Count I also underpin Plaintiff's California Military and Veterans Code § 394 claim in Count IV, and because USERRA and the California statute share a statutory framework, the merits of Counts I and IV remain connected.  *See Flores v. Von Kleist*, 739 F. Supp. 2d 1236, 1257-58 (E.D. Cal. 2010) (adopting that approach).

*Travelers Insurance Co.*, 514 U.S. 645, 658-60 (1995)).  As an example of when the first prong is met, the Supreme Court in *Travelers* cited *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 84 (1983).  *Travelers*, 514 U.S. at 657-68.  In *Shaw* (as retold by *Travelers*), the Court had "no trouble" finding that New York's Human Rights Law (a comprehensive anti-discrimination statute) "relate[d] to" benefit plans under ERISA § 514(a).  *Travelers*, 514 U.S. at 657 (brackets in original).  Because the Human Rights Law had the effect of prohibiting employers from structuring and administering their benefit plans in a way that discriminated on the basis of pregnancy, employers could honor the statute only by varying the terms of their benefit plans.  *Id.*

As with New York's Human Rights Law, California Military and Veterans Code § 394 and Plaintiff's negligence claims carry the same effect when applied to ERISA-governed benefit plans, namely, the B-Plan.  Just as the pregnancy protections in the Human Rights Law shape how employers can structure and administer their benefit plans, here, Continental could not have complied with state law without making substantive changes to the B-Plan.  To avoid the "underpayment of B-Plan and PRAP retirement account contributions," as Plaintiff alleges in his Third Amended Complaint ¶ 110, the Company needed at least to adjust the March 13, 2007 Pilot Bulletin's formula for calculating pension contributions during military leave periods.  Preemption thus is warranted here.

Confirming today's decision, the relevant case addressing ERISA § 514(a) preemption of a state statute protecting service members found preemption.[2] *Singletary v. Prudential Insurance Co. of America*, 105 F. Supp. 3d 627, 637-38 & n.13 (E.D. La. 2015). Also instructive, courts following *Shaw* have preempted claims under other state anti-discrimination statutes because they too effect the structure and administration of employee benefit plans. *E.g.*, *Devlin v. Transportation Communications International Union*, 173 F.3d 94, 99 (2d Cir. 1999) (age discrimination claim under New York's Human Rights Law); *Brown v. Sysco Food Services of Metro New York LLC*, No. 14-474, 2014 WL 5410650, at *4 (D.N.J. Oct. 22, 2014) (race discrimination claim under the New Jersey Law Against Discrimination); *Barber-Colman Co. v. Barbosa*, 940 F. Supp. 1269, 1270, 1273 (N.D. Ill. 1996) (age discrimination claim under the Illinois Human Rights Act).

Having found that Counts IV and V relate to an employee benefit plan, this Court must next consider whether any exception saves Plaintiff's state law claims from preemption. ERISA § 514(d) carves out an exception when the statute otherwise would "alter, amend, modify, invalidate, impair, or supersede any law of the United States." 29 U.S.C. § 1144(d).

To support the application of ERISA § 514(d) in this case, Plaintiff cites *Shaw*, 463 U.S. at 100-05, 108-09, which applied the exception to New York's Human Rights Law to the extent the statute protected practices that also were

---

[2] For completeness, this Court adds that the parties cited another Louisiana Military Service Relief Act case, but it involved complete preemption. *Day v. Lockheed Martin Space Systems Co.*, No. 10-730, 2010 WL 2545345 (E.D. La. June 17, 2010), *affirmed*, 428 Fed. Appx. 275 (5th Cir. 2011). Complete preemption under ERISA § 502(a), of course, is different from conflict preemption under ERISA § 514(a).

unlawful under federal law, specifically, Title VII.  In reaching this conclusion, the Supreme Court emphasized that ERISA § 514(d) saves state law claims when part of a joint state and federal enforcement scheme, but also warned that, in no event, should the exception be transformed into a general savings clause.  *Id.* at 102-04. Title VII, as the Court explained, created a joint state and federal enforcement scheme, with the EEOC looking first to state agencies to resolve discrimination claims and deferring to their decisions.  *Id.* at 101-02.

*Shaw* is distinguishable, however, because USERRA lacks a similar joint state and federal enforcement scheme.  The existence of such a scheme was the "key" to the Supreme Court's holding in *Shaw*.  *Barber-Colman*, 940 F. Supp. at 1272; *see also Devlin*, 173 F.3d at 100-01 (emphasizing Title VII's joint state and federal enforcement scheme as critical to the Supreme Court's holding in *Shaw*). Plaintiff does not (and cannot) rebut this key difference between Title VII and USERRA, but instead responds that because ERISA does not preempt USERRA and USERRA does not preempt state laws that expand on its protections, 38 U.S.C. § 4302, ERISA does not preempt these state laws either.  *Shaw*, however, rejected this very syllogism as overbroad and simplistic:

> The Court of Appeals properly rejected the simplistic "double saving clause" argument—that because ERISA does not pre-empt Title VII, and Title VII does not pre-empt state fair employment laws, ERISA does not pre-empt such laws.  Title VII does not transform state fair employment laws into federal laws that § 514(d) saves from ERISA pre-emption.

*Shaw*, 463 U.S. at 101 n.22.  At bottom, USERRA not preempting broader state laws is a world apart from USERRA creating a joint state and federal enforcement

48

scheme, like Title VII, that is saved under ERISA § 514(d). For these reasons, this Court finds that ERISA § 502(a) preempts Count IV and Count V to the extent they regard Continental's ERISA-governed B-Plan.

### E. Count V: Negligence (Against UCH, United, Continental and ALPA)

Last, in Count V, Plaintiff brings a negligence claim against all Defendants, arguing that they breached their duty of care to not violate any federal or state statutes. Defendants respond that Plaintiff's negligence claim is barred under *San Diego Building Trades Council, Millmen's Union, Local 2020 v. Garmon*, 359 U.S. 236 (1959), which sets forth that federal law preempts state law claims that impose liability for conduct that is arguably protected or prohibited by federal labor relations law, here, the Railway Labor Act.

In this case, Plaintiff seeks to impose state law duties for Defendants' negotiation, implementation and administration of collective bargaining agreements, and in allocating the $400 million payment. This Court need not discuss Defendants' argument at length or address whether any exception might apply because *Garmon* preemption has a "broad scope," *see Kaufman v. Allied Pilots Association*, 274 F.3d 197, 200, 202-03 (5th Cir. 2001), and Plaintiff has failed to respond to this argument altogether. *See Mitsui Sumitomo Insurance Co., Ltd. v. Moore Transportation, Inc.*, 500 F.Supp.2d 942, 956-57 (N.D. Ill. 2007) (discussing waiver principles). *Garmon* preemption thus bars Plaintiff's negligence claims.

Having found that federal law preempts Count V, this Court need not address Defendants' additional arguments for summary judgment.[3]

## IV. Conclusion

For all of these reasons, Defendants' summary judgment motion [161] is granted in part and denied in part. This case is set for a status hearing on April 7, 2016 at 9:45 a.m. in Courtroom 1725. The parties should come prepared to set a case management schedule.

Dated: March 29, 2016

Entered:

John Robert Blakey
United States District Judge

---

[3] In particular, this Court need not address a potentially dispositive argument that Defendants did not raise: whether Plaintiff can engraft a duty of care from USERRA and its California state law counterpart. To that point, in *Guy v. Alabama Power Co.*, No. 13-8, 2013 WL 3929858, at *4 (M.D. Ala. July 29, 2013), the Court dismissed a negligence claim based, as here, on the employer's alleged failure to comply with USERRA and its Alabama counterpart.